We have Alexander Munches for the appellant and Chelsea Caston for the athlete. Mr. Munches, you may begin when you're prepared to. Good afternoon. May it please the Court, Counsel. My name is Alexander Munches. I'm with the Office of the State Appellate Defender and I represent Scotty Thompson. The State accused Mr. Thompson of one of our most serious criminal offenses, first-degree murder. Despite the significance of this allegation and despite the evidence in Mr. Thompson's guilt, the State repeatedly encouraged the jury to return a verdict grounded in confusion and in emotion, not a rational deliberation of the facts. The honors know that no trial is perfect. This trial, however, was a mess. Parallel errors, including improper testimony, an inflammatory or irrelevant argument, call into question the overall fairness of the trial. Let's begin with the parties' theories of the case. The State sought and received a two-count indictment against Mr. Thomas. One count of intentional murder, one count of strong probability murder. Mr. Thompson's defense was that he committed second-degree murder. He raised imperfect self-defense, that he believed he was acting in self-defense at the time of the killing, but he conceded that that belief was objectively unreasonable. Thus, he was not justified. The narrow issue for the jury should have been whether Mr. Thompson subjectively believed that deadly force was necessary when he struck Jones with a hammer twice. Now, the State misdirected the jury and distracted them from this very narrow issue. To see why, we suggest that the Court first look to the closing arguments. There, the State repeatedly misstated the defense's theory of the case. The State falsely asserted that Mr. Thompson had testified that Jones' death was an accident, and the State recast the defense. Contradictory, the State recast the defense as one of justification or pure self-defense. At the start of its closing argument, the State read aloud portions of the element's instruction for first- and second-degree murder, but summarized them as, what that means is that it is Mr. Thompson's burden to prove to you that he was justified in his use of force. Now, the State's misconduct in closing argument parallels some misconduct that occurred at trial. The State raised the specter of a robbery, either to suggest that Mr. Thompson was guilty of felony murder, or to suggest that he had not proven perfect self-defense. It's kind of unclear, from the record, what exactly the strategy was there. When you say raised the specter, didn't he admit or testify to taking money out of his pocket? Sure. When we say raised the specter, we mean that initially the State, in its opening statement, asserted that my client had beat and robbed and killed Jones. And so that's where the specter was raised initially. And the State also misled the jury in seeking what they called a counter-instruction. The instruction stated, an IPI instruction stated, the person is not justified in the use of force if he is committing robbery. This was not at issue at trial. Mr. Thompson, of course, conceded that he was not justified in his actions. So it's not clear why the State wanted the instruction exactly or what they were trying to do, but we know that it was not issued properly before the jury. The State, again, sees an evidentiary gap of its own making. Its expert testified that Jones was still alive when he went into the water. That was apparently not supported by the expert's own report, which she testified that she did not test for drowning. So this was a sort of cause of death that did not appear anywhere in the coroner's report, but was asserted as fact at trial numerous times by the State. Well, that was all kind of muddled up, I thought, because it seemed like she did determine a cause of death. Blunt force trauma. Excuse me? Blunt force trauma. Right, yeah. And then said that, you know, she did not determine whether or not drowning could have, I guess, contributed to the death. Yes, she noted it in the back page of the report, the preliminary findings section, and she didn't draw any conclusions. On the front page of the report you see cause of death, significant contributing factors. All you see is blunt force trauma. And defense counsel cross-examined her on this issue, you know, surprised by the assertion. And she said, I think the court has chosen not to do that at that time. So she made some sort of preliminary finding. We don't know what sort of physical phenomena all go into a, you know, medically certain determination of drowning. We know that she made some sort of finding, but she didn't actually test for drowning. And, yes, she testified that Jones went into the water alive, and the State ran with that in opening and closing, said Jones drowned. So we have some errors occurring in closing, arguments. Well, I guess if she did say he went into the water alive, then he did drown, but that may not have actually been the ultimate cause of death. I mean, it doesn't make sense. Yes, she didn't explain it. She didn't explain it. And we know that the experts are on the stand. How did that prejudice him? So we recognize that we're presenting this theory on appeal in an extraordinary light, namely, prong two of the plein air doctrine. And this doctrine, as this court knows, is not solely concerned with prejudice, but is also concerned with the integrity of the trial as a whole. How did that affect the integrity of the trial? I mean, he basically admitted that, I mean, there's a question of how many times he struck him, but. And, sure, Mr. Thompson testified that he left Jones on the dock, not in the water. And so, you know, to the extent that this surprise testimony from the court. After he carried him around in the car. I mean, it's pretty apparent he was in. The state. Very, very critical, awful shape when he left it. Yes, I agree. The state's case was strong, which just makes it all that much of a head scratcher as to why these sort of instances of misconduct occurred. But my question, then, is how does it affect the integrity of the trial? I think if the state seizes an evidentiary gap from its own expert and exploits that at trial, that that is a fundamentally unfair instance of prosecution that, you know, calls into question the overall fairness of the trial. These are the sorts of facts that should be disclosed prior to trial. These are the sorts of facts that the defense should consider as it's preparing the state of the case. I think that these are critical things. But, of course, under Problem 2.0, we relied on this court's judgment to look at the case as a whole and decide, has all these instances of misconduct called into question the overall fairness? I would also like to point out that the state did stoke the jurors' emotions, and this was a murder case which are inherently emotional in trying, and the state stoked that. The state repeatedly argued propensity that Mr. Thompson was simply a murderer who enjoys killing. The state set the stage and opening by comparing Mr. Thompson to an animal on the hunt. According to the state, Mr. Thompson preyed upon Jones and lured him away. The state returned to the scene in its cross-examination of Mr. Thompson. The state began by inquiring, how long have you been free before you murdered someone else? Was the first person you murdered a stranger to you, too? The state brought this point home in closing argument. First, in the opening portion where it said, Mr. Thompson, murdering someone is enjoying his life. That's what he's doing. That's how one enjoys it. This one enjoys his life. He murders people. Then in rebuttal, yet again, he hit him twice and he snapped. Because he's a murderer, and he hit him 26 more times. This is simply an appeal to the jury's emotions. And murder trials are, of course, emotional, but this is just propensity plain and simple. And then finally, a final point about the years of trial. The jury did receive a hodgepodge of incorrect definitions concerning the presumption of innocence, a better art principle. What sort of tied these sort of multiple definitions together is that many of them failed to tie the presumption of innocence to the entirety of deliberations. And we just highlight one of the misstatements, which was the state, in closing, before discussing the elements of first-degree murder, suggested that the presumption disappears if the state meets the burden, in its case, in chief. It said, Mr. Thompson had a presumption of innocence, and it's gone. It's been long gone because you've been proven guilty beyond a reasonable doubt. So I just want to say that, in summary, Mr. Thompson knows he's asking his court for extraordinary relief under the Plain Air Doctrine. Specifically, he asks that this court take a close look at the record and find that the state repeatedly encouraged the jury to return a verdict grounded in confusion and in emotion, not a rational deliberation of the facts. In Illinois, our concept of justice is not only concerned with convictions for criminal acts, but also trials predicated on fairness. If this court finds that a fair trial did not occur, then this court should act as a guardian of constitutional rights and the integrity of the criminal justice system, and accordingly reverse the remand for a new trial. Thank you, Mr. Montes. We'll have the opportunity for rebuttal. Ms. Kasten. May it please the Court. Counsel. Chelsea Kasten on behalf of the state. Your Honors, given the detailed facts provided to the jury, it cannot reasonably be said that the jury in this case returned a verdict with anything other than a dispassionate evaluation of the facts, many facts which the defendant himself provided when he testified on his own behalf. That is in addition to the overwhelming evidence that was provided by the state in this case. The defendant's defense was difficult to prove given the overwhelming evidence that there was regarding this brutal murder. None of the allegations were addressed by the trial court below and are only subject to plain error review in this case. So whether the evidence is closely balanced or the errors of such magnitude that the commission thereof denied the accused of a fair and impartial trial. Specifically turning to the issue of the death by drowning since the court was asking so many questions of opposing counsel. Whether it was cranial, cerebral, or trauma or the drowning, either way, the defendant's actions are the cause of death for the victim in this case. Had he not left him either on the dock or in the water, since that is not entirely clear, without the water he still would have died because of the blunt trauma to the body that was clear from the report. This court can look to the People's Attached Appendix A to see the report that was filed from the initial examination by the doctor in this case. The immediate cause of death was listed as a cranial blunt trauma, but drowning was also listed as a secondary preliminary autopsy finding. So in addition to that, the charging instrument also said that the victim was struck about the head with a blunt force object and placed the victim in a body of water knowing such acts created a strong probability of death or great bodily harm. So regardless of what they want to argue the ultimate cause of death was, the cause of death was caused by the defendant. Next, Your Honors, whether the defendant met his burden demonstrating a subjective belief that he was justified in killing was a question for the jury to decide, and they decided that he was not justified in his claim of self-defense. In turning to the charge of robbery, Your Honors, it was the mechanics of the act of robbery that proved the motive and the beating that led to the death or the murder of the victim in this case. Evidence of other crimes is admissible if it is relevant to any purpose other than to show that he had a propensity to commit the crime, and in this case it demonstrated the motive, and the defendant's use of force in this case is relevant to the jury's consideration as an ultimate fact finder about what happened in this case. In addition, Your Honor, in looking specifically at the jury instructions that were read, the court has to look at the jury instructions in its entirety. You can't limit it to just that one instruction. It has to be looked at everything that was read. The adequacy of tendered jury instructions should not be determined in isolation, but should be examined in light of the overall charge. So the instructions as a whole accurately conveyed the law to the jury. In addressing the charge that the state inflamed the passions of the jury, Your Honor, just as an initial matter, obviously opening and closing arguments are not evidence, and the presumption is that the jury was properly instructed in this case as to the law, and so if the state wasn't proper in its comments, it was remedied by what was stated by the trial court when it was instructing the jury. The statements made just go to when a prosecutor has the right to comment on the evidence. They are allowed to draw legitimate inferences deducible from the evidence, even if they're unfavorable to the defendant, and to comment on the credibility of the witnesses. They can also comment that his case is uncontradicted. Counsel, what about this propensity evidence? You know, I guess the state's attorney commenting on the defendant being a murderer. Was that error? Allow that in? Your Honor, it wasn't directly clear if he was referring to the fact that he said he murdered the victim in this case. Or that it was that he had murdered before. Well, yes, Your Honor. So that's not entirely clear from the record exactly which murder he was referring to, and I know that sounds bad, but presumably he was referring to the fact that he'd already admitted in this case that, yes, I did kill the victim. I just didn't mean to do it. And whether or not he meant to do it went to the jury for them to decide. Was it first or second degree murder?  What about this closing argument? I know you get a little leeway in closing argument, but where the state's attorney says, hey, you know, if you go home at night, what are you going to tell your family? You know, I'm paraphrasing, but maybe you can comment on that evidence. Say, what are you going to do? Are you going to be able to look your family in the eyes? You know, there was something along those lines. Yes, Your Honor, there was. That might have been a dodgy statement to be made. However, again, Your Honor, this is under plain error review, and the presumption is that the trial court properly instructed the jury. It was already deliberating, you know, not if he murdered the individual, but did he prove his defense that he had a subjective belief that he was justified in the murder. Considering that he testified that he acted in the manner anyone would in that situation, the jury just didn't believe him. Given all the facts that he testified to, his activities that he was doing after the murder, you know, what he went and picked up, who he picked up, what he was doing, all those facts showed someone who was not conducting, well, not conducting, but who had a subjective belief that they were justified, but someone who, as he said to the parole office, was out enjoying his life. Again, the evidence in this case was so overwhelming. It was a difficult defense for the defendant to prove some kind of subjective belief that he was justified in the murder. It wasn't until 18 months after his arrest that he presented a story about the victim picking up a stick and swinging it at him, and that's when he struck the victim. But he could only remember two of the hits out of the many that were on the body. It was just not a very believable story, and the jury did not believe it. And so the presumption, Your Honors, is that the jury instructions would have remedied any error in opening or closing arguments, but what's more, there's such overwhelming evidence in this case. It's a difficult burden, as the defendant, their opposing counsel has already admitted. It's difficult to meet the burden in this case, and they cannot demonstrate that there was an error of such magnitude that it somehow denied the defendant of a fair trial where he's coming forward not saying, no, I didn't commit the murder, but I had a subjective belief that I was justified in the murder. And then the believability of his testimony went to the jury to decide, and they decided that it was not a reasonable subjective belief. Unless the Court has any more questions, we would ask that you affirm the ruling of the lower court. Thank you. Thank you. Mr. Munchen? We would just like to conclude by saying, of course, this particular poem of Plain Air is very difficult to meet, and of course the State had evidence of Mr. Thompson's guilt. The argument is really premised on the idea that when the State tries someone in the State of Illinois, that that person, regardless of what you think of their guilt or innocence, receives a fair trial. And in this case, the State repeatedly misstated the defense theory of the case. The State surprised the defense with new facts, and the State stoked the jurors' emotions. This is, of course, an emotional matter. This is a murder case. But the State simply didn't come to play fairly that day. And what we're asking this Court is to take a close look at the briefs, take a close look at the record, use this Court's experience and decide, is this a sort of trial that we can affirm? Can we say that this was okay, that this is how murder trials can go in Illinois? And if that's the case, that's the case. But Mr. Thompson's committee was not. We ask that this Court find that a fair trial did not occur, that this Court act as a guardian of constitutional rights, integrity of the criminal justice system, and in doing so, reverse the remand for a new trial. Thank you, Mr. Munchen.  Thank you, Mr. Thompson. We'll take the matter under advisement under the ruling of due course. Okay? Next case on today's docket is the case of People of the State of Illinois v. Scotty Thompson. Next case is the People v. Leonard Parker. And we have Elizabeth Prottick for the appellant. And we have Luke McNeil for the athlete. And you may begin your argument, Mrs. Prottick. Excuse me. May it please the Court? Counsel? My apologies. My name is Elizabeth Prottick, and I represent Leonard Bill Parker in his appeal of the trial court's denial of leave to file a successive post-conviction petition in this case. As this Court is well aware, in 2012, the Supreme Court determined in Miller v. Alabama that children are different from adults in numerous ways that diminish their culpability and increase their rehabilitative potential. The new rule established by Miller has both substantive and procedural components, and this past year our Supreme Court admonished that the Supreme Court's far-reaching commentary about the diminished culpability of juveniles is neither crime nor sentence-specific. It is in this context that Boe asks this Court to reverse the trial court and remand for a determination on the merits of his numerous claims of constitutional errors for the first time. Subject to this Court's questions, I will focus my arguments today primarily on Boe's claims regarding his guilty plea and then briefly touch on the distinct but interrelated sentencing issues. By way of background, Boe has now been incarcerated since age 16 in August 2000, nearly 18 years, due to his guilty plea for felony murder, where in the underlying offense he did not kill, intend to kill, or commit any act of violence, but in fact was a reluctant participant in a robbery plot hatched by his 26-year-old sister, her 22-year-old boyfriend, and his 18-year-old sister. He tried to back out multiple times and yet was charged for the offense of first-degree murder. Boe pled guilty and abandoned his swift attempts at withdrawing his plea under the specific threat that he could be sentenced to a natural life sentence. Following the determination in Miller and its subsequent progeny, a natural life sentence could not reasonably be applied to Boe, given his age, his personal characteristics, and the facts of this particular case. Again, leave to file a successive post-conviction petition should only be denied when it is clear that the claims fail as a matter of law and the supporting documentation is insufficient to justify further proceedings. This burden is less than the second-stage standard of post-conviction petitions. Now first, a bit about the procedural posture in this case. None of Boe's claims have ever been adjudicated on their merits. He was persuaded by the court and counsel not to pursue his withdrawal of the guilty plea. He appealed his sentence only, but appellate counsel moved for withdrawal and that was dismissed. His initial post-conviction petition, filed in 2010, was dismissed as untimely. And, in fact, there wasn't even a preliminary hearing in this case. So there's never been, this case has never been addressed on its merits and none of the errors presented in the successive post-conviction petition have been heard. Again, he need not establish the merits of his claims conclusively at this stage. He need only set forth a prima facie case of both cause and prejudice. As this case, as all of his claims of error rely on Miller and the subsequent decisions, cause is established because that case was decided in 2012, well after the initial proceedings in this case and his first post-conviction petition. Now in assessing his claim regarding his guilty plea, he need only show a reasonable probability that he would not have pled guilty had he had a correct understanding of the Eighth Amendment and the implications of Miller. In assessing this claim, though, the court should not be limited simply to the decision in Miller, but should consider the full circumstances of the plea here in determining whether his plea was, in fact, knowing and voluntary in light of Miller. The issue is not whether Bo could have been sentenced to 50 years, 60 years, or natural life. It is that the threat of natural life compelled his guilty plea when the record shows that he otherwise wanted to go to trial and that that choice would have been reasonable in light of the facts of this case. The hallmark features of youth set forth in Miller, including immaturity, impetuosity, failure to appreciate risks and consequences, these are all evident in these plea proceedings. In particular, there is evidence of an inability to deal with police and prosecutors and assist in his own defense. Counsel, is there an issue in this case regarding the felony murder aspect? Yes. Is there an issue with his constitutionality as it pertains to minors under, I guess, both the Ohio and the U.S. constitutions? Yes. Okay. You're probably going to get to that. I'm just jumping ahead here. Sure, sure. If the court has questions, I'll be happy to entertain those specifically. Yeah, that's what I kind of want to hear about, the felony murder aspect. Sure. And that is a, we raised, in addition to his guilty plea and sentencing arguments, we also raised a challenge to the constitutionality of the statute under which he was convicted. The circumstances of this case are remarkable. This is a 16-year-old in light of what we know not only about his chronological age, but what we know about juveniles generally and those specifically. He was a poor student in special education, hadn't finished ninth grade, had untreated ADHD, had a tumultuous childhood, bounced around from home to home with his mother in a number of different school districts, experienced violence in the home. His father had a criminal history. He experienced emotional and physical abuse at the hands of mother's boyfriends. He witnessed repeated violence against his mother. All these are factors that affect his development, his ability to make decisions, and evidence of a complete lack of adult guidance in decision-making or really anyone to call when he found himself in this harrowing situation. Now, he went to go visit his 26-year-old sister who promised his mother, don't worry, he won't get in trouble, I'll be looking out for him. Instead, they spent the week with her 22-year-old boyfriend and his sister, drinking and using drugs. And when they ran out of the money to take him back home to his mother, his, again, 26-year-old sister decided, let's rob my children's grandfather. She was the undisputed mastermind in the situation. The particular details of the planning of the offense aren't clear from the record. What exactly was contemplated at the time, and potentially some violence was discussed before they got there, certainly murder was never on the table. Beau himself, the night of the incidents, initially said, I don't want to go. And then three adults convinced him, you have to go along. This is the exact peer and family pressure that Miller warns us against. Then when he gets to this isolated trailer down a country road, he again says, I don't want to go through with it. They sent him in to pretend to use the phone of the victim. And the adult male, the 22-year-old Fraley, was supposed to follow him in. Instead, Beau comes back out. He says, I can't, I don't want to do this, let's not do this. Fraley put his affidavit, pressured him into it, gets him to go back in. Beau again comes back out, says, I can't do this. Then they go in together the third time. And the record at this point is there's some factual distinctions about what was actually said by Fraley to Beau at that moment. Both Fraley's affidavit and the successive petitions say Beau had no knowledge that a murder would occur before the event. And based on the procedural posture of this case, that's what this court should consider. Now, there was some mention that he said offhandedly to Beau, you know, if you knock him out, I'll kill him. Well, Beau never knocked anyone out. He didn't hit anyone. He didn't touch Mr. Fraley. He goes in the third time with Fraley, pretends to use the phone, and Fraley then independently goes and stabs this man 36 to 37 times and stomps on his body. Only at that point, after witnessing this heinous violence and directly being instructed by Fraley to do so, did Beau go and look for money as instructed. Now, in light of this series of events and in light of Beau's youth and his particular characteristics, holding him responsible for felony murder, a first-degree murder charge, has no rational basis in the law. And that is the basis for our claim that felony murder is unconstitutional as applied in this case. There's no way that a juvenile with this diminished capacity could have foreseen that a murder would take place, could have extricated himself from the situation, or could have stopped this adult from independently completing this vicious murder. And it is not within a rational – there's no rational basis for doing so. And for that reason, at minimum, this should be returned to the trial court for additional post-conviction proceedings. And turning back to the guilty plea proceedings in this case, again, they were marked by his youth and the hanging specter of a threat of a natural life sentence. And there are a number of factors that the court should consider along with those in determining whether this was, in fact, a knowing and voluntary plea, and whether Beau should at least be given the opportunity to go back to the trial court and present these errors and have a court determine on the merit of these issues whether he's entitled to relief. Now, his only opportunity to discuss the state's plea offer with counsel was in the hallway of the courthouse while he was both shackled and under monitoring of a guard. That was established through counsel's own motion to withdraw the plea. Counsel had acknowledged to him that she'd never represented anyone on a charge as serious as murder. She did juvenile proceedings. And she advised him to enter into this guilty plea only two and a half weeks after reviewing only an initial discovery and the amended information. There was no preliminary hearing. Per her fee request, there was no investigation. There was no legal research or motion practice other than a single motion to, a single basis motion to transfer this back to juvenile court. Now, Beau then received the same offer from the state as his 26-year-old sister, who was the undisputed mastermind and a decade older than him. They were admonished together at the plea hearing, and so Beau was instructed at that plea hearing that he could have faced 20 to 60 years life imprisonment or, in fact, the death penalty. That admonishment was repeated both by the prosecutor and the state. And it's undisputed that Beau could not have faced the death penalty, yet he was told twice when entering the plea that he could. That error was not corrected by counsel, and it was only corrected by the court at the sentencing hearing. But then the court again erred and admonished Beau that he was facing 20 to 80 years. There was no admonishment about a possible fine. Trial counsel allowed Beau to go on the record and discuss the facts of the case, despite the fact that he had a pending motion to withdraw. And then at the subsequent hearing on the motion to withdraw, counsel allowed the state to aggressively cross-examine Beau about the facts of this case, despite that being completely outside the scope of her direct examination and including incriminating facts. Now, in fact, the state didn't object to Beau's motion to withdraw the plea. He could have done so had he proceeded. But both counsel and the court pushed him into withdrawing his motion by repeatedly telling him he could face life in prison. In fact, the court ordered counsel to discuss the matter with Beau off of the record. Only after that conversation did he come back and withdraw his motion to withdraw the plea. And another key point here is that the court told him that if he withdrew this plea, that the state could proceed on all four murder counts. There's only one death in this case, and so he could only have been convicted on one count. Now, the court's language is admittedly somewhat ambiguous and doesn't, but this is clarified by the post-conviction filings, which clarify that counsel had not explained to him that he could only be convicted of one count of murder. So this plea, with serious questions about the level of counsel he received, serious problems with the admonishments, was only secured by threat of additional charges, which could not have been held, but more in particularly the looming threat of this serious sentence, which was a natural life sentence or a number of years equivalent to natural life. Now, in addition to these troubled circumstances, the court should consider this issue in light of his youth, his inability to understand these issues, and as noted, his limited education and difficult history. Given the circumstances of this plea, it would have been completely rational for Beau to reject the plea had he understood the constitutional vulnerability of life or lengthy terms of years as set forth in Miller, Alcort's decision in Holman, and the progeny of these decisions. Now, turning to Beau's sentencing arguments briefly, there are essentially three distinct but related bases for addressing this sentence. He makes a direct claim that his 35-year sentence that he received is not constitutional following the court's pronouncements in Miller and its progeny, because it does not grant him a reasonable probability at release within his lifetime. Second, he disputes the constitutionality of the sentencing proceedings in this case, because the trial court sentenced him in direct opposition to the considerations of Miller. And further, that even if this court does not find that Miller is directly applicable to his sentencing considerations, the sentence was issued without due consideration of his highly evident rehabilitative potential and limited involvement in this case, which under our Illinois constitution does not counsel a term of year sentence as severe as 35 years. Now, excuse me, sorry. The trial court's analysis in this case unquestionably did consider age. It did consider that Beau was the younger participant. But what it also did on the record was consider recent enactments at that time by our Illinois legislature in the shadow of the era of the super predator and increasing criminal penalties in the 1990s. It mentioned the Truth in Sentencing Act, the lowering of the juvenile age transfer and other pronouncements and said, I'm taking these as a cue from the legislature that deterrence is working, that we have these serious sentences and I should be increasing sentences for persons such as this. That's directly contradictory to the findings of Miller, even Roper and Graham, and the subsequent decisions of our courts and the Supreme Court. At this point, Beau's sentence allows for release at age 51. Now, certainly the average person would not see 51 as an old age. They wouldn't see this as close to death. But what we know about youth who are incarcerated at such a young age, youth who have the degree and number of adverse childhood experiences that Beau did, and persons in our prison system, particularly what we know about the standards of incarceration at Menard, where Beau has spent much of his incarceration, strongly suggests that his life expectancy is exceedingly diminished. Now, I'm not asking and Beau is not asking that this court make a determination about when he's likely to die. That's not necessary to decide his case, and it's certainly not necessary to decide that he is deserving of remand to present these issues to the trial court in a second-stage post-conviction proceeding with the assistance of counsel. But the court should also not turn a blind eye to the very real conditions that he's faced in his life that affect whether or not he has a meaningful opportunity following this sentence to live his life. Again, considering the influence of his three-year-old co-dependents, one of which was his sister and supposed to be looking out for him, considering his limited and highly reluctant participation in this event, considering his complete lack of violence or violent history, and considering what Miller demands we consider about youth in general, we ask this court to at minimum remand Beau's case for additional post-conviction proceedings for him to present the merits of these errors to the trial court for the very first time. Thank you. Thank you. Mr. McNeil. May it please the court? Yes. As for the... Would you introduce yourself? I'm sorry. I'm John McNeil, or Luke McNeil, from the Fourth District Appellate Prosecutor's Office. It's for the recording. Yes. Sorry, I forgot that you do that here. As for the... There was extensive discussion about basically ineffective assistance of counsel. This argument was not raised in defendant's motion for leave to file a successive petition. It was, however, raised and rejected in his first post-conviction petition, so clearly that issue is not properly before the court. And there was also extensive discussion on improper admonishments. There's no reason why. I'm not sure if that was specifically raised in the first post-conviction petition, but there would be absolutely no reason why it was not. Therefore, it's procedurally defaulted as far as the issues raised in this successive petition. That's why the procedural posture is important in this case. This was the trial court denying leave to file a successive post-conviction petition. Defendant has the burden of establishing cause and prejudice at that point. The trial court correctly found that Miller doesn't apply to this 35-year sentence, which is the only way to get around the cause hurdle, but Miller does not apply to this 35-year sentence. Therefore, the prejudice prong was not established here. The trial court's analysis was correct. The most familiar case procedurally is Jackson, which two arguments ago they talked about also. In that case, just like here, there was a denial of leave to file a successive post-conviction petition. The defendant argued that his 50-year sentence was a de facto life sentence pursuant to Miller, which was not available at the time of sentencing. All of that is directly the same as this case, except for the fact that this case involves a sentence 15 years shorter. Still, the appellate court in that case stated that defendant's 50-year sentence is within today's permissible sentencing range, thus defendant's sentence is not excessive when measured against the standard of today's statutes, which were newly revised by the legislature pursuant to new case law. That case law, of course, is Miller, Roper, and Graham. Jackson should be very instructive to this court in this situation, except for dealing with the sentence significantly shorter. Evans, also cited in my brief, makes it pretty clear and has a great summary about Illinois authority on this de facto life sentence issue. No case has ever held anything close to as short as a 35-year sentence to be a de facto life sentence. I think the Evans court is very persuasive when they state that was an arguing of 45-year sentence was a de facto life sentence. Prison life is undoubtedly harsh, but it invites us into the weeds of actuarial tables, asking us to make a legal determination of the defendant's likely lifespan. The same can be said here, except you would need to go even deeper into the weeds, because defendant in this case gets out of prison when he's only 51 years old. And again, all the Illinois authority on this matter, although it's not a clear cut, when a de facto life sentence starts, all the authority suggests that something as short as a 35-year sentence is clearly not a de facto life sentence. The other procedural difference in this case is, of course, this was a guilty plea. However, that supports the state's position as well. A guilty plea has long been held to be an enforceable contract, or at least contract principles apply to the two parties involved, defendant and the state, with both of them bound to their agreement. Here, the state provided consideration by knocking 10 years off the sentencing cap from 20 to 60 to make it 20 to 50, and defendant ended up with a sentence of 35 years directly in the middle of his sentencing range and on the lower half of the regular sentencing range. Important in this is that defendant's position is basically that an arguably beneficial case came out later, even though he entered into a valid plea at the time. Any beneficial case law, therefore, violates his due process rights, and he can raise a constitutional argument in any successive post-conviction petitions after that. That's clearly not how it works, and both parties should be bound to their agreement as to this guilty plea. It was valid then, and more importantly, it's valid now. Let's assume that defendant was negotiating his plea today with Miller intact. His sentencing range would still be 20 to 60 years, barring any aggravating factors, which I think everyone can agree this was a brutal and heinous murder. Defendant's participation is up in the air as to how much of that is his responsibility. However, it was a brutal and heinous murder, so natural life was not off the table. But still, even assuming it was just 20 to 60 years, the state's agreement to only cap the sentencing recommendation at 50 years is still a consideration for the defendant. Even if he was negotiating his plea agreement today, this would still be a valid plea agreement, and clearly it was valid at the time. So the defendant failed to establish any prejudice here, and especially any prejudice that, quote, so infected the trial that the resulting conviction or sentence violated due process. The trial court did not err in finding that defendant failed to establish that requisite prejudice. The as-applied challenge, constitutional challenge, is even easier to dismiss. This is a 35-year sentence, as I stated. I included numerous cases in my brief with a longer sentence that were held to not be de facto life sentences, including Jackson, I've already talked about, was 50 years, Applewhite, 45, Gibson, 52, Evans, 45, and Hoy, 52. These are substantially longer than the 35-year sentence here, and in all those cases it was held to be not a de facto life sentence. As for the factual basis in this case, we have to remember this well. The only thing we do have to go by is the factual basis. Defendant, of course, understandably paints a picture in his most flattering light. However, a completely different picture can be painted from the same factual basis. One, it's undisputed that defendant admitted to police that his accomplice told him he was going to murder the victim or intended to murder the victim before they went into the victim's home. So clearly defendant not only should have foreseen the likelihood of a murder, he subjectively did or knew it was at least possible, most likely inevitable, that a murder was going to take place. So what we have here is that still he willingly participated in this robbery. Instead of helping the victim at all, he robbed the victim while he was being stabbed dozens of times and did not help the victim at all. So a completely different picture can be painted from the factual basis, as the one defendant describes, one that was a willing participant in a brutal and heinous murder. He did not pull the knife, but he was an accomplice and a participant in this, and he knew that murder was a likelihood in this situation. So clearly the 35-year sentence here as applied was not unconstitutional pursuant to the federal constitution. The trial court probably found that there was no prejudice here. The Illinois constitutional challenge is procedurally barred, and also the improper sentencing argument. Both of these are procedurally barred. They rely solely on language from Roper and Graham. Even Miller in this section as to a youth offender's reduced culpability, reduced development, reduced intelligence, almost that whole section of Miller is quotes or cites from Roper and Graham. Both of those were available to the defendant at the time of his first post-conviction petition. He failed to raise this issue in that petition, failed to provide any reason why he didn't raise these issues in his motion to leave or successive post-conviction petition. Therefore, they are defaulted. However, I may be daring to leave as to the improper sentencing. The trial court mentioned specifically on the record multiple times that it considered the defendant's youth as a mitigating factor and stated clearly and specifically that he was going to get a shorter sentence than his accomplices because of his youth. So clearly the trial court did not err in sentencing the defendant here improperly, took his youth into consideration. Also, the proof is in the pudding. He got a 35-year sentence directly in the middle of the 20- to 50-year range he could have received. Counsel, what about opposing counsel's argument that at the time of the sentencing, the court mentioned deterrence as being a factor he relied upon and that today the argument is, Well, I think deterrence is still an official sentencing aggregating factor in the statutes in Illinois. Miller is definitely, Miller, Graham, Roper are beneficial to the defendant's position here.  Just because favorable case law or arguably favorable case law existed at the time of the plea does not invalidate the guilty plea as it was given. Defendant here got a sentence in the lower half of the sentencing range. And Miller, Roper, and Graham, albeit favorable, do not invalidate that guilty plea. Especially, it's, even if defendant didn't take the guilty plea and was sentenced to 60 years and he thought, Well, Miller's my get-out-of-jail-free card. I don't need to plead guilty. I can go to trial and say my sentence is excessive. It's not an open-and-shut case that Miller would be applicable to defendant even if he got a 60-year sentence after a trial. I mean, there's cases that hold pretty close to 60 years are not a de facto life sentence. Therefore, defendant would still be taking a risk in going to trial and saying, Oh, Miller will have my back when I challenge this on review if I get an extensive sentence. It still would be a risk. The defendant mitigated that risk by pleading guilty, and he got a favorable sentence out of that. As for the felony murder statute argument, this was raised for the first time in this appeal, this appellate brief. It was not raised at all in the defendant's successive post-conviction petition, his motion to leave, or any pleadings at all below. Therefore, the trial court obviously had no way to rule on this specific issue and didn't rule on this specific issue. But more importantly, it's not properly before your honors in the appellate court. Jones, which I cited in my brief, states that any issue raised for the first time in an appeal is not properly before the appellate court. Also, the plain language of the Post-Conviction Act states any issue not raised in a petition is procedurally barred, and that is the case there. However, it also fails on the merits. I think we both agree that the rational basis test was the proper one for the felony murder statute argument. That means the statute's upheld under the rational basis test so long as it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable. A legitimate legislative purpose for the felony murder statute is to limit the violence that accompanies the commission of forcible felonies. Here, the defendant was only 16 years old and may have not been able to see the foreseeable consequences of participating in this forcible felony if we didn't know that one of his accomplices didn't tell him before they went into the house that a murder was probably going to happen. The defendant still participated in this. The defendant specifically knew in this case whether he was developmentally challenged or not. He specifically knew directly before this crime took place that a murder was going to happen, or at least a murder was likely to happen. This is a clear-cut case of exactly what the legitimate legislative purpose of the felony murder statute is trying to limit. Clearly, even if this argument was not procedurally defaulted and not properly before this Court, it fails on the merits as well. Unless the panel has any more questions, I would ask this Court to affirm. I don't believe we do. Thank you. Thank you for your argument, Mr. McNeil. Ms. Crotty, do you have a vote? Thank you, Your Honors. First, the State indicates that the issue of ineffective assistance of counsel was not raised and that it was, in fact, raised and rejected in the initial post-conviction petition filed earlier. This is a misstatement. The initial post-conviction petition was rejected on the basis of timeliness, not on the merits of the argument. And in this petition, Mr. Parker does not directly raise an ineffective assistance of counsel claim, but he does raise a general claim that the proceedings that led to his guilty plea were in violation of due process. And in considering that claim, it's not enough to consider the Miller decision or the plea negotiations. You must consider the full factors that led to this plea and the deficiencies of counsel, the admonishments of court. Though perhaps they could have been raised if he had moved to withdraw his plea or in other situations, they certainly are relevant to the consideration of his Miller claim about his guilty plea. Second, the State dwelt to some degree on what decision, what sentence Mr. Parker would have received following a trial. That's irrelevant. What the court needs to consider in assessing this guilty plea is what Mr. Parker would have done had he understood the implications of Miller. Accepting a guilty plea of 50 years or 60 years as a cap is not reasonable in light of Illinois and federal decisions on Miller cases. And certainly given the facts of this case, the compelling mitigating factors in his particular situation, his assertion that he would not have pled guilty, he should have an opportunity to present that to the trial court in additional post-conviction proceedings. Again, now this was brought up in a prior argument today, but for the record, the case of Buffer, which addresses de facto life, and Evans are both pending before the Supreme Court. The PLAs were granted in those cases. And while that addresses the complex issues of what a de facto life sentence, it doesn't answer the question here of whether Beau actually has a meaningful opportunity at release within his lifetime and whether the proceedings in this case satisfy the procedural requirements of Miller. Further, because we are on appeal of the successive post-conviction petition, where the law is unsettled, that actually weighs in Beau's favor. At minimum, he should be allowed a chance to go back to the trial court and present these rather egregious errors to the trial court for a decision on the merits. Finally, consideration of youth or age, as was admittedly done to some degree in this case, is not the same thing as consideration of the Miller factors as required not only by that decision, but specifically mandated by our Supreme Court decision in Holman, that the court look at not only the chronological age, but evidence of particular immaturity, impetuosity, failure to appreciate risks and consequences, family and home environment, the degree of participation in offense and evidence of familial or peer pressure, incompetence, inability to deal with police officers, prosecutors, or assist his own attorney, and the juvenile's prospects for rehabilitation. The sentencing hearing does not reflect a consideration of those factors and, as noted, in fact relies on consideration of deterrence and other matters which are directly contrary to consideration here. The state finally emphasizes the factual basis here. That's not the only thing we have to rely on. We also have the petition itself, which must be taken as true, and the affidavit of the co-defendant, Flaley, both of which assert that Bow did not know ahead of time that a murder would take place and did not want it to happen, did not in any way participate. Relying on the factual basis to say that is somehow rebutted by the record is not only unreasonable, but ignores the fact that this is, A, a factual basis, and, B, that it's based on an incompletely recorded statement of a 16-year-old to police without a parent or guardian present, without the assistance of counsel, who told his father that he was under pressure from his adult co-defendants, including his sister, to take greater responsibility during the police interrogation because he was a juvenile. Thank you. Thank you, Ms. Crowley. Thank you, Mr. McNeil. We'll take the matter under advisement. The ruling in due course we're going to take.